UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-80361-CIV-COHN/SELTZER

KARLYLE ALVINO,

    Plaintiff,

v.

EQUINOX HOLDINGS, INC.,

    Defendant.
_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court on Defendant's Motion for Summary Judgment [DE 23] ("Motion"). The Court has carefully reviewed the Motion and all related filings and is otherwise fully advised in the premises.[1]

**I.    Background**

    **A.    Material Facts**[2]

---

[1] Defendant has also filed two Motions in Limine seeking to exclude certain evidence and arguments at trial. See DE 39; DE 41. As discussed further herein, the Court concludes that Defendant's Motion for Summary Judgment should be granted. Thus, the Motions in Limine will be denied as moot.

[2] Plaintiff's Oppositional Statement of Material Facts [DE 32-1] does not respond to many of the paragraphs in Defendant's Statement of Undisputed Facts [DE 24]. And Plaintiff responds to other paragraphs with identical, generalized statements that the record citations often do not support. See S.D. Fla. L.R. 56.1(a)(2). All material facts recited by Defendant, supported by the record, and not properly controverted by Plaintiff are deemed admitted. See S.D. Fla. L.R. 56.1(b).

    In addition, Plaintiff relies on a declaration that she filed three months after being deposed. See DE 33-1. Some facts asserted in the declaration conflict with Plaintiff's deposition testimony, and the Court will disregard those written statements. See Van T. Junkins & Assocs. v. U.S. Indus., 736 F.2d 656, 657 (11th Cir. 1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such

### 1.     Plaintiff's Employment with Defendant

Defendant Equinox Holdings, Inc., ("Equinox") operates health clubs in Florida and elsewhere.  In January 2012, Equinox hired Plaintiff Karlyle Alvino as a personal trainer at its South Beach location (the "Club").  See DE 17 (Am. Compl.) at 2, ¶ 7; DE 20 (Answer to Am. Compl.) at 2, ¶ 7.  Alvino reported to Personal Training Manager Lizette Cabeza and to Fitness Manager Marios Hortis.  See DE 24 (Def.'s Statement of Undisputed Facts) at 1, ¶ 1.  When she was hired, Alvino signed an Employment Agreement containing a non-compete provision.  See id.; DE 25-1 (Dep. of Karlyle Alvino, Ex. 4) at 107.  Alvino also received a copy of Equinox's Harassment Policy, which bans sexual harassment by coworkers, managers, and members.  See DE 25-1 (Dep. of Karlyle Alvino, Ex. 3) at 104; DE 25-2 (Decl. of Christopher Grys) at 3-4, ¶ 9.

The Club's personal trainers are assigned paid floor shifts several days per week to give them an opportunity to obtain clients.  See DE 24 at 1, ¶ 3.  Floor time allows the trainers to market their skills and to solicit new clients.  See id.  Trainers are also encouraged to spend time in the Club working out or training with other trainers so that members will meet them and be encouraged to train with them.  See id. at 2, ¶ 4.  To that end, personal trainers are given free Equinox memberships, valued at $2,156.05 per year in 2012, so that they can work out at the Club at no cost.  See id.  During her employment, Alvino was assigned between twelve and twenty hours of floor shifts per

---

an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony.").  The Court will likewise deny Plaintiff's motion for leave to file a corrected version of her declaration, which attaches certain advertising photographs that were omitted from the original declaration.  Nothing indicates that these photos were produced to Defendants in response to their discovery requests for such documents, and Plaintiff never mentioned the pictures in her Complaint or deposition.  Therefore, the Court will not consider these exhibits in ruling on Defendant's Motion.

week, and she may have worked more hours if she picked up shifts from other trainers. See DE 25-4 (Decl. of Marios Hortis) at 3-4, ¶ 7.

When Alvino worked at Equinox, all new trainers were expected to perform minimum numbers of paid training sessions each month. See DE 24 at 2, ¶ 5. Those numbers gradually increased from fifteen sessions in the first month of employment to ninety sessions during the fifth month. See id. Trainers are generally given five to six months to meet their production goals, after which their employment is terminated if they are unsuccessful. See id. at 2, ¶ 6.

From the start of her work at Equinox, Alvino struggled to gain clients. See DE 24 at 2, ¶ 8. Over her eight months as an Equinox trainer, Alvino fell far short of meeting her goals, performing just a fraction of the required sessions. See id. at 2, ¶ 9; id. at 3, ¶ 13. She was consistently in the bottom half of all trainers and was often at the very bottom. See id. at 3, ¶ 10. Cabeza, Hortis, and General Manager Christopher Grys regularly coached Alvino about her poor performance. See id. at 3, ¶ 11. Because Alvino had not come close to satisfying her minimum production goals, on October 9, 2012, Cabeza and Hortis met with Alvino to terminate her services as a personal trainer. See id. at 3, ¶ 14.

In October 2012, Alvino was also teaching two group-fitness classes per week: a half-hour abdominals class and a forty-five-minute kettle bell class. See DE 24 at 3, ¶ 15. Equinox allowed Alvino to remain employed as a group-fitness instructor. See id. In late November 2012, a personal trainer told Grys that two of Alvino's former clients had advised the trainer that Alvino had approached them to train outside of Equinox. See id. at 3-4, ¶ 16. Alvino knew that under her non-compete agreement, she was prohibited from soliciting Equinox members for outside training. See id. at 4, ¶ 16.

3

On November 28, 2012, Grys sent an e-mail to Alvino instructing her to stop contacting former clients, warning that this conduct was a ground for termination, and asking her to confirm her understanding.  See DE 25-1 (Dep. of Karlyle Alvino, Ex. 9) at 111.  Alvino never responded to this e-mail.  See DE 24 at 4, ¶ 18.  Grys therefore directed Group Fitness Director Geoff Bagshaw to terminate Alvino's services as a group-fitness instructor for violating her non-compete agreement.  See id. at 4, ¶ 19.  Alvino's employment with Equinox ended on December 31, 2012.  See id.

### 2. Plaintiff's Sexual Harassment Allegations

In late May or early June 2012, Alvino told Grys that another personal trainer, Ari Weinstein, had asked her to go outside the Club with him when he moved his car in the parking garage earlier that day.  See DE 24 at 4, ¶ 20.  Alvino further reported that she had gone with Weinstein to move his car and that after they had done so, he sexually assaulted her.  See id.; DE 25-2 at 7, ¶ 21.  At her deposition, Alvino described the alleged assault:

> I saw this crazy villain look across his face.  He shoves his hand under my butt, grabs it as hard as he could and my reaction was to freak out.  What the hell are you doing?  I jumped out of the car.  I was kind of laughing out of embarrassment and shock.  Holy s**t, I cannot believe that happened.
>
> I slammed the car door.  Did not know how to feel about it and started to walk away.  He approached me from behind and put me in a chokehold.  He's a muscular guy, big guy, with big arms.  I was stuck and couldn't get out, you know.  It turned out to a bit of a struggle.  His hand went up my shirt, very aggressively, very painfully, and he tried to go down my pants, you know.  I got away a little bit, started to run, two or three steps he grabbed ahold of me.  This was another chance for me to get away.  You know, we were in a compromised state of me not being able to do much.  He had a complete hold of my person from behind.

4

> It wasn't until somebody, I don't know who. A lot of the members drive very nice cars, that are loud, very large engines. The engine noise startled us, he loosened his grip for a moment and I ran to the elevator and returned back into Equinox.

DE 25-1 at 24-25.

Grys directed Alvino to speak to her female supervisor, Cabeza, and told Alvino that Equinox would have to advise its Human Resources department of the incident. See DE 24 at 5, ¶ 22. Cabeza and Regional Manager Brett Orlando contacted Lauren Pacifico in Human Resources and worked with her to investigate Alvino's claim. See id. at 5, ¶ 23. Alvino spoke to Pacifico by phone but does not remember what was said. See DE 25-1 at 27; DE 25-3 (Decl. of Lizette Cabeza) at 7, ¶ 24. Weinstein was interviewed by Cabeza and Orlando but denied any wrongdoing. See DE 24 at 5, ¶ 25. On June 5, 2012, Equinox terminated Weinstein's employment. See id. at 5, ¶ 26. Alvino recalls that Weinstein's discharge occurred "very, very shortly" after she spoke to Human Resources: "[I]t felt immediate. I don't know if it was the same day, the next day or within the next week, but it felt it happened one second after another." DE 25-1 at 28.

Other than Alvino's complaint, Equinox had not received any other sexual-harassment reports about Weinstein, who had been trained in the company's anti-harassment policy. See DE 24 at 5, ¶ 27. And though Weinstein was designated as a "master trainer" and helped Alvino when needed, he was her co-worker and had no ability to affect or influence the terms and conditions of her employment. See id. at 6, ¶ 29; DE 32-1 (Pl.'s Oppositional Statement of Material Facts) at 2, ¶ 29; DE 36-3 (Suppl. Decl. of Marios Hortis) at 3, ¶ 4.

5

In addition to being terminated, Weinstein was banned from the Club indefinitely. See DE 24 at 5, ¶ 28. Because Weinstein's girlfriend worked at Equinox's Coral Gables location, the Coral Gables General Manager, Tom Krieger, was advised that Weinstein was also barred from that club due to his termination. See id. Krieger instructed the Coral Gables Fitness Manager not to allow Weinstein inside. See DE 25-5 (Decl. of P. Thomas Krieger) at 8, ¶ 29. Alvino testified that after Weinstein was terminated, she saw him once at the Coral Gables club while she was there for work. See DE 36-1 (Dep. of Karlyle Alvino) at 7-8. But Alvino never reported Weinstein's presence to Equinox. See DE 24 at 5, ¶ 28.

Alvino further alleges that she was sexually harassed by male Club members. Eight of these members she trained no more than twice, and two members she trained several times. See DE 24 at 6, ¶ 34. None of Alvino's regular clients acted improperly toward her. See id. Alvino contends that the members at issue made inappropriate comments to her, including requesting dates, remarking on her looks, and making nonsexual statements about how to train. See id. at 6, ¶ 35. When asked to name the worst of these incidents, Alvino responded that a client had said he "wanted to see [her] in sexy outfits" like his daughter wore. DE 25-1 at 77.

Alvino was expected to comply with Equinox's dress code for trainers, which includes a short-sleeve Equinox cotton t-shirt and black sweatpants, shorts, or leggings of the trainer's choosing. See DE 24 at 6, ¶ 33. Alvino claims, however, that a female manager suggested that Alvino wear shorts, a regular bra instead of a sports bra, and other clothing that would attract clients. See DE 25-1 at 33, 36. For a couple of weeks, Alvino tried to follow some of this advice, but she felt uncomfortable and stopped. See id. at 35, 37-38.

6

### 3. Plaintiff's Compensation

During Alvino's employment in 2012, Equinox maintained two electronic timekeeping systems to record trainers' time: E-Time and E-Club. See DE 24 at 7, ¶ 38. E-Time was used to track time worked on floor shifts. See id. Trainers were required to clock in at the start of each floor shift and to clock out at the end of that shift. See id. E-Time was also utilized to track meetings, mandatory seminars, and educational training classes. See id.

E-Club was used to record personal-training sessions and related tasks. See DE 24 at 7, ¶ 39. When a member arrived for a training session, a voucher was printed and given to the member. See id.; DE 25-1 at 15. The member then gave the voucher to the trainer, the member's account was debited, and the session was entered into E-Club. See DE 24 at 7, ¶ 39; DE 25-1 at 15. Personal-training reports were printed at the end of each pay period and distributed to trainers' mailboxes. See DE 24 at 7, ¶ 39. Trainers had the opportunity to make any changes to the reports and verify the information as accurate. See id.

Each employee was responsible for accurately recording her total time worked, and Alvino admits that she did so. See DE 24 at 7, ¶ 40. Trainers were given a productivity report on a weekly basis to ensure that all of their training sessions were captured by the system. See id. More, Alvino concedes that she always reported every person she trained and truthfully recorded her time. See id. at 8, ¶ 41. Equinox's records reflect that, over the course of her employment, Alvino worked from a minimum of 12.5 hours per week to a maximum of 29.6 hours per week. See DE 24 at 9, ¶ 51.

Alvino received $8.00 per hour for all time during orientation. See DE 24 at 8, ¶ 42. Personal trainers are also paid $8.00 per hour for floor shifts and the same rate

7

for Equinox Fitness Training Institute ("EFTI") and PT Forum.  See id.  Trainers receive $11.00 per hour for Equifit sessions (initial fitness assessments) and a like amount for new members' complimentary training sessions.  See id. at 8, ¶ 43; DE 25-1 at 14.

Starting as a Tier I Trainer, Alvino was paid $23.00 for each training session.  See DE 24 at 8, ¶ 44.  She was raised to a Tier II Trainer at the end of February 2012, after which she was paid $26.50 per session.  See id.  The session rates for trainers increased at the end of September 2012.  See id.  Trainers are advised that these rates include all tasks associated with the training session, such as communicating with the client, creating and updating the training plan, and scheduling the session.  See id. at 8, ¶ 45.  This policy has existed for at least five years, and all trainers are informed of it during their orientation.  See DE 36-2 (Suppl. Decl. of Christopher Grys) at 3, ¶ 5.  Further, the policy has never changed, even though the September 2012 revised rate summary added the policy language expressly.  See id.

At no time did Alvino complain to Equinox that she was being paid improperly.  See DE 24 at 7, ¶ 40.  Her Performance Commission Report and payroll records confirm that she was correctly paid for all personal-training sessions, Equifit sessions, and complimentary training sessions.  See DE 24 at 9, ¶ 48.  Too, Alvino was properly paid for all scheduled floor shifts, PT Forum meetings, and EFTI.  See id. at 9, ¶ 49.[3]

Alvino "hope[s]" her supervisors knew of additional hours she claims to have worked off the clock.  DE 25-1 at 93-94.  She testified that her managers expected her to be at the Club eleven to eighteen hours a day.  See id. at 54; DE 36-1 at 5 (confirming that on "[m]ost days" she would "sit there 11 to 18 hours a day, seven days

---

[3] Group-fitness instructors are paid a fixed rate for each class (including preparation time), depending on the length of the class.  See DE 24 at 9, ¶ 50.  Alvino offers no evidence that she was paid incorrectly for her group-fitness classes.

8

a week"). This alleged expectation was based on a manager's comment that two successful trainers had "lived at the club when they first started." DE 25-1 at 54; see DE 33-1 (Decl. of Karlyle Alvino) at 2, ¶ 13. When asked what she was doing for all those hours, Alvino replied, "Just being there, face time, walking around, meeting people, offering free sessions. . . . I hardly worked out at the club." DE 25-1 at 55-56.

Equinox's written policies, however, required trainers to obtain approval from management to work overtime (which Alvino never did), and off-the-clock work was prohibited. See DE 24 at 10, ¶ 54; DE 25-3 at 15, ¶ 56. More, Alvino was often seen hanging out at the juice bar, by the front desk where one of her roommates worked, or in the clothing shop where a friend of hers was employed. See id. at 9, ¶ 53. Alvino admits she spent hours "standing by the front desk" and "a lot of time" in the store. DE 25-1 at 81. She was generally socializing with other employees—not doing anything that could be deemed productive or compensable. See DE 24 at 9, ¶ 53.

B. **Procedural History**

In October 2013, Alvino filed this action against Equinox in Florida state court. See DE 1-1 at 2-7 (Compl.). Equinox later removed the case to this Court based on diversity jurisdiction. See DE 1 (Notice of Removal). Alvino's current Amended Complaint alleges gender discrimination in violation of the Florida Civil Rights Act ("FCRA"). See DE 17 at 3-4. In particular, Alvino maintains that Equinox subjected her to a sexually hostile work environment. See id. at 2-3. She further claims that Equinox violated the Fair Labor Standards Act ("FLSA") by willfully failing to pay her required minimum and overtime wages. See id. at 5-6.[4] The Amended Complaint seeks various

---

[4] Alvino also pleaded an FCRA retaliation claim, see DE 17 at 4-5, but she withdrew that claim in her Response to Equinox's Motion. See DE 32 at 1.

9

damages, as well as attorney's fees and costs.  See id. at 4, 6.  Equinox has answered the Amended Complaint, denying liability and asserting defenses.  See DE 20.

Regarding her claim for unpaid wages, Alvino has filed a Statement of Claim and, more recently, a Supplemental Statement of Claim.  See DE 18; DE 34.  Although difficult to follow, these claim statements are based on what Alvino "was told she would be compensated" at the outset of her employment.  DE 18 at 1; DE 34 at 2.  She explains that her calculations "extrapolate[] the hours over forty" because Equinox "did not pay her on the basis of any ascertainable formula."  DE 18 at 2; DE 34 at 2.  Yet Alvino admitted in her deposition that "there is an ascertainable formula."  DE 25-1 at 98.  Overall, the first claim statement seeks liquidated and unliquidated damages amounting to $209,131.80, and the second statement requests total damages of $94,536.00.  See DE 18 at 2; DE 34 at 3.  Equinox has responded to both claim statements in detail, asserting several flaws in their assumptions and calculations.  See DE 21; DE 40.

In its present Motion, Equinox seeks summary judgment on Alvino's hostile-work-environment and unpaid-wage claims.  See DE 23.  Alvino has filed a Response opposing the Motion, and Equinox has replied.  See DE 32; DE 35.  To support their arguments, the parties have also submitted documentary evidence.

## II.   Discussion

### A.   Summary Judgment Standards

Summary judgment may be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying

10

those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  To satisfy this burden, the movant must demonstrate that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.

If the movant makes this initial showing, the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).  "If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(3).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker, 911 F.2d at 1577.  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).

A court's function at the summary-judgment stage is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue

11

for trial." Id. at 249.  In so doing, the court must view the facts in the light most favorable to the non-movant and draw all reasonable inferences in that party's favor. See Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).  The court also must discern what issues are material:  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted." Anderson, 477 U.S. at 248.

### B.   Analysis of Defendant's Motion

#### 1.   Hostile Work Environment Claim

The FCRA makes it unlawful for an employer to "discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, national origin, age, handicap, or marital status."  Fla Stat. § 760.10(1)(a).  This statute is patterned after Title VII of the Civil Rights Act of 1964, see 42 U.S.C. § 2000e–2(a)(1), and courts generally apply Title VII case law to discrimination claims brought under the FCRA.  See Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1195 n.1 (11th Cir. 2004).  To establish a gender-discrimination claim based on a hostile work environment, an employee must show

(1)   that he or she belongs to a protected group;

(2)   that the employee has been subject to unwelcome sexual harassment, such as sexual advances, requests for sexual favors, and other conduct of a sexual nature;

(3)   that the harassment must have been based on the sex of the employee;

(4)   that the harassment was sufficiently severe or pervasive to alter the terms and conditions of

12

>>employment and create a discriminatorily abusive working environment; and
>
>(5) a basis for holding the employer liable.

Reeves v. C.H. Robinson Worldwide, Inc., 594 F.3d 798, 808 (11th Cir. 2010) (en banc) (internal quotation marks omitted).  Here, Equinox's Motion focuses on the fourth and fifth elements—the severity and pervasiveness of the claimed harassment and the basis for holding Equinox liable.

Regarding the fourth element, Title VII does not serve as a "general civility code." Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal quotation marks omitted).  "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not constitute a hostile work environment.  Id. (citation & internal quotation marks omitted).  Instead, this element is satisfied only "'[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys. Inc., 510 U.S. 17, 21 (1993) (internal quotation marks omitted).  Further, "the plaintiff must prove that the environment was both subjectively and objectively hostile." Reeves, 594 F.3d at 809.  "The employee must 'subjectively perceive' the harassment as sufficiently severe and pervasive to alter the terms or conditions of employment, and this subjective perception must be objectively reasonable." Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999) (en banc) (quoting Harris, 510 U.S. at 21-22). More, "the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998) (internal quotation marks omitted).  These circumstances may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work

13

performance." Harris, 510 U.S. at 23; see also Mendoza, 195 F.3d at 1246-47 (collecting decisions that found workplace misconduct insufficient to prove actionable sexual harassment).

Concerning the fifth element above, when sexual harassment is allegedly committed by an employee's co-worker or customer, the plaintiff "must show that the employer either knew (actual notice) or should have known (constructive notice) of the harassment and failed to take immediate and appropriate corrective action." Watson v. Blue Circle, Inc., 324 F.3d 1252, 1259 (11th Cir. 2003). To establish actual notice, the employee must prove that "management knew of the harassment." Id. If the employer "has a clear and published policy that outlines the procedures an employee must follow to report suspected harassment and the complaining employee follows those procedures, actual notice is established." Id. Constructive notice, by contrast, is demonstrated "when the harassment was so severe and pervasive that management reasonably should have known of it." Id.

Alvino's alleged sexual assault by co-worker Ari Weinstein was a very serious, physically threatening encounter that unreasonably interfered with her work performance. See Harris, 510 U.S. at 23. Alvino testified that the assault traumatized her for a significant period, and any reasonable person in her position likely would have had a similar reaction. See Oncale, 523 U.S. at 81; Mendoza, 195 F.3d at 1246. Despite the severity of this incident, however, the record shows conclusively that Equinox cannot be held liable for it. As soon as Alvino reported the attack to Equinox, the company took "immediate and appropriate corrective action." Watson, 324 F.3d at 1259. Equinox management and personnel investigated Alvino's report and promptly terminated Weinstein's employment. Equinox also banned Weinstein from entering the

14

Club where Alvino worked, as well as the Coral Gables club where Weinstein's girlfriend was employed, and it took reasonable steps to enforce this ban. Alvino claims that she once saw Weinstein at the Coral Gables club, but she never reported his presence to Equinox. In sum, no substantial evidence provides a basis to hold Equinox liable for the claimed assault.

With respect to Alvino's allegations of harassment by Club members, no triable issue of fact exists about whether these events were "sufficiently severe or pervasive to alter the terms and conditions of [Alvino's] employment and create a discriminatorily abusive working environment." Reeves, 594 F.3d at 808. The incidents were limited to members' comments that Alvino found offensive, and they did not involve any physical threats or unwanted touching. See Harris, 510 U.S. at 23. Even assuming that Alvino was subjected to these "offensive utterance[s]" with some frequency, id., no reasonable person in her position could have found the comments "sufficiently severe and pervasive to alter the terms or conditions of [her] employment." Mendoza, 195 F.3d at 1246; cf. Faragher, 524 U.S. at 788 (noting that Title VII is not a "general civility code").

Nor does Alvino's related testimony that Equinox managers encouraged her to wear provocative clothing establish a genuine dispute of material fact about whether a hostile work environment existed. Alvino testified that she was uncomfortable with, and embarrassed by, that clothing. See Harris, 510 U.S. at 23. Yet she wore it for just a couple of weeks, and no evidence shows that it unreasonably interfered with her work performance. See id. Like her claim regarding members' inappropriate comments, this evidence does not come close to proving "severe or pervasive" harassment that "create[d] a discriminatorily abusive working environment." Reeves, 594 F.3d at 808; see Mendoza, 195 F.3d at 1246-47.

15

For these reasons, the Court finds that no substantial evidence supports Alvino's FCRA hostile-work-environment claim. Equinox is thus entitled to summary judgment on that claim.

### 2. FLSA Claim

In support of her FLSA unpaid-wage claim, Alvino testified that she spent eleven to eighteen hours at the Club nearly every day. She now contends that she should have been compensated for all those hours. But Equinox's records show that Alvino was accurately paid for her compensable time—which she admits recording truthfully—in accordance with the rate schedule that applied to every trainer.

Alvino seeks payment for other time that she was present at the gym, though not on the clock. Under Equinox's written policies, however, working overtime required permission from management, and off-the-clock work was not allowed. More, when Alvino was at the Club, she was often seen hanging out at the juice bar, the front desk, and the clothing shop—not doing any productive work. And her manager's general remark that two successful trainers had "lived at the club when they first started" did not obligate Equinox to pay Alvino for whatever time she chose to spend at the Club.

Based on this evidence, Alvino has not shown a genuine dispute of material fact about whether Equinox owes her unpaid minimum or overtime wages. The Court will therefore grant summary judgment to Equinox on the FLSA claim as well.

### III. Conclusion

For the reasons discussed, it is hereby

**ORDERED AND ADJUDGED** as follows:

1. Defendant's Motion for Summary Judgment [DE 23] is **GRANTED**;

2. Plaintiff's Motion for Leave to File Corrected Declaration [DE 37] is **DENIED**;

3. Defendant's Motion in Limine No. 1 to Exclude All Evidence and Testimony Related to Plaintiff's Supplemental Statement of Claim [DE 39] and Motions in Limine Nos. 2–9 to Exclude Certain Evidence [DE 41] are **DENIED AS MOOT**; and

4. The Court will enter a separate Final Judgment consistent with this Order.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 17th day of November, 2014.

_____
JAMES I. COHN
United States District Judge

Copies provided to:

Counsel of record via CM/ECF